**Rose Marie BENSON, individually and in her capacity as personal representative of the Estate of Steven W. Benson, Plaintiff**

v.

**UNITED STATES of America, Defendant.**

**No. 02–CV–6–B–S.**

United States District Court, D. Maine.

May 19, 2003.

Terrence Garmey, Smith, Elliott, Smith & Garmey, P.A., Portland, ME, Keith Jacques, Smith, Elliott, Smith & Garmey, P.A., Saco, ME, for Rose Marie Benson, Individually and in her capacity as Personal Representative of the Estate of Steven W Benson.

Evan Roth, Office of the U.S. Attorney, Portland, ME, for USA.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, Chief Judge.

Decedent Steven Benson's ("Benson") widow brings this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680, to recover for alleged medical malpractice by employees of the United States Department of Veterans Affairs. After a two day non-jury trial that began on April 14, 2003, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law (Docket # 22, 23, 24). Pursuant to Rule 52(a), the Court makes the following findings of fact and conclusions of law. Fed. R.Civ.P. 52(a).

## I. FINDINGS OF FACT [1]

### A. Enlarged Prostate and Appearance of the Cheek Lesion

1. In November 1995, doctors at the Veterans Hospital in Togus, Maine ("Togus VA") noted that Benson had a prominent protrusion in the floor of his bladder that might represent an enlarged prostate.

2. On May 1, 1997, the Togus VA again noted that Benson's prostate was enlarged and admitted him for a transurethral resection of the prostate ("TURP").[2] The TURP findings were negative for cancer.

3. On July 29, 1997, Benson first complained to Dr. Myers at the Togus VA of a lump in his right cheek that he thought might be an abscessed tooth.

4. On September 3, 1997, Benson again complained to the doctors at the Togus VA that the swelling in his cheek was growing larger. As a result, Dr. Myers made a request for a surgical consult, but the consult was never performed.

### B. Cheek Biopsy

5. In February 1998, Benson went to Eastern Maine Medical Center ("EMMC") with complaints of suprapubic abdominal pain. EMMC treated the pain. In addition, EMMC noted that Benson had a lump in his right cheek and referred him to the Togus VA for an evaluation.

6. In January 1999, Benson made further complaints to the doctors at the Togus VA that the lump in his cheek was

---

1. The Court relies on Benson's complete medical records, which were admitted into evidence, in summarizing Benson's medical history.

2. A transurethral resection is a procedure that samples a portion of the prostate by means of a resectoscope passed through the urethra. *Blakiston's Gould Medical Dictionary* 1393 (4th ed.1979).

getting larger and harder. The doctors at the Togus VA were uncertain whether the lump was an abscessed tooth or a tumor. On January 8, 1999, the matter was referred for a surgical consult.

7. In March 1999, Dr. Diehl at the Togus VA provided a surgical consult in which he noted that "Mr. Benson presents with a right facial mass that has been present for at least a year, if not longer ... I do not know what this represents ...." (*See* Def.'s Ex. 169). Dr. Diehl then ordered a computerized tomography ("CT") scan of the cheek lesion.

8. The results of the CT scan showed no obvious abnormality. Nevertheless, Dr. Diehl referred Benson to the Veterans Hospital in Boston, Massachusetts ("Boston VA") for a second surgical consult opinion.

9. The Boston VA performed biopsies on May 5, 1999, and May 20, 1999, to assess the limits of the lesion.

10. After the May 20 biopsy, the pathologist reported that:

> While some ... stains performed on th[e] lesion led support to a diagnosis of melanoma ..., the strong cytokeratin positivity ... strongly argues against this interpretation and favors a poorly differentiated carcinoma (primary appendageal, local extension from an[ ] underlying tumor or metastatic from an unknown primary) ....

(*See* Def.'s Ex. 165).

11. On June 9 1999, Benson returned to the Togus VA for treatment with Dr. Feleppa.

12. Dr. Feleppa informed Benson that he suffered from a virulent form of skin appendageal cancer that had progressed from a lesion on his right cheek to invade the lymph nodes on both sides of his neck.

13. Dr. Feleppa stated that she wished she could have treated Benson's cheek lesion sooner because his cancer was now very far advanced and likely incurable.

14. Dr. Feleppa explained that she would attempt to treat Benson with chemotherapy, but that he would not be a candidate for radiation therapy unless he had a good response to the chemotherapy.

C. Treatment and New Symptoms

15. On June 14, 1999, Benson began his chemotherapy treatment.

16. In September 1999, the Togus VA began radiation treatment due to his positive response to the chemotherapy.

17. Benson tolerated the treatment well and was able to continue enjoying certain activities, such as golf.

18. After January 2000, however, Benson's condition began to rapidly deteriorate.

19. In January 2000, Benson was admitted to the Togus VA for a bone biopsy, which revealed possible metastatic disease to the bone.[3]

20. In addition, a CT scan of Benson's abdomen showed that his bladder had collapsed.

21. On February 4, 2000, a cystoscopy revealed that Benson was suffering from an obstruction around his urethra.[4] The Togus VA also noted that Benson's urinary function had diminished dramatically.

---

3. The term "metastatic disease" describes cancer that spreads to other organs or to lymph nodes other than those near the primary tumor. *See National Cancer Institute Cancer Facts,* available at http://cis.nci.nih.gov/fact/6_20.htm(last visited May 16, 2003).

4. A cystoscopy is a procedure used to diagnose and treat lesions of the urinary bladder, ureter, and kidney. *Medical Dictionary* at 352.

22. On February 14, 2000, a scan of Benson's abdomen was consistent for metastatic disease, though not conclusive. Similarly, on February 17, 2000, the Togus VA found changes that were consistent with metastatic disease in the liver.

23. On April 2, 2000, the Togus VA admitted Benson for probable urosepsis.

24. On May 16, 2000, the Togus VA admitted Benson for possible jaundice or a urinary tract infection.

25. Throughout this time Benson's prognosis was guarded with a high suspicion of metastatic disease, but tests could not confirm the condition.

### D. Discovery of Transitional–Cell Carcinoma

26. On May 4, 2000, EMMC discovered metastatic disease in the lumbar spine.

27. On May 9, 2000, an EMMC bone biopsy revealed the presence of a rare uniform epithelial cancer.[5]

28. On May 22, 2000, EMMC decided to perform a second TURP. The pathologist's report from the TURP stated that Benson suffered from "poorly differentiated carcinoma with lymphatic invasion and signet ring cells, consistent with poorly differential transitional-cell carcinoma."[6] (*See* Def.'s Ex. 377).

29. As of June 20, 2000, Benson was suffering from end-stage cancer.

30. On June 23, 2000, Benson died at the age of 55 of a wasting disorder and renal failure.

### E. Expert Testimony at Trial

31. At trial, Plaintiff presented expert testimony by Dr. Douglas Pohl, the Director of Pathology at Central Maine Medical Center, and Dr. Donna Thompson, an oncologist with Hematology and Oncology Associates in Lewiston, Maine, to prove that Benson's cheek tumor was the primary source of his cancer and that Defendant's failure to promptly treat it caused his death.

32. Defendant's experts, however, presented ample evidence to rebut Plaintiff's expert testimony and demonstrate an alternative cause of death. The Court credits the testimony of Defendant's experts over that of Plaintiff's experts.

33. Defendant's first expert, Dr. Young, who is a senior pathologist at Massachusetts General Hospital, explained that, unlike metastatic sites, primary cancer sites are typically characterized by diffuse cell growth.

34. Upon reviewing Benson's pathology slides, Dr. Young testified that the sample of Benson's prostate revealed diffuse growth typical of a primary site, whereas the cheek slide showed a more localized or focused pattern of cell growth characteristic of metastatic sites. According to Dr. Young, the difference in the slides was highly probative of the fact that Benson's cancer originated in his prostate and metastasized to his cheek.[7]

---

**5.** Epithelial cancer is a malignant growth containing epithelial cells originating from the epithelium. *Medical Dictionary* at 457, 217.

**6.** Transitional-cell carcinoma is a malignant tumor composed of epithelial cells from the transitional epithelium of the urinary tract. *Medical Dictionary* at 1392. At trial, Defen-

dant's expert, Dr. Robert Young, testified that the transitional epithelium lines the bladder, urethra, and the tributaries from the prostate to the urethra, which he referred to as the "prostatic ducts."

**7.** To be exact, Dr. Young testified that Benson's cancer originated in his prostatic ducts.

35. In addition, Defendant's second expert, Dr. Clark, who is the director of a head and neck tumor clinic at Massachusetts General Hospital, testified that cancer cells do not typically metastasize to the prostate. Dr. Clark explained that cancer cells spread most often to the liver, lung, bone, brain, and skin. According to Dr. Clark it is rare for cancer cells to metastasize to the prostate.

36. Dr. Clark testified that in his many years of experience[8] he has never seen metastasis of cancer cells to the prostate, although he has seen several instances of transitional-cells spreading from the prostate to the skin.[9] Accordingly, Dr. Clark testified that it was his opinion that Benson's cancer spread from his prostate to his cheek, and not the other way around.

37. By the time Benson's prostate cancer spread to his cheek, Dr. Clark testified that there was no effective cancer treatment. Therefore, according to Dr. Clark, Defendant's delay in performing a biopsy of Benson's cheek lesion made no difference in preventing Benson's death.

38. Moreover, Dr. Young testified, as did Dr. Clark, that in the thousands of cases on which he has worked he has never seen an instance of a head or neck tumor spreading to the prostate.

39. Finally, both Drs. Young and Clark testified that it is common for primary tumors to go undetected for significant periods of time, in spite of extensive tests.

## II. CONCLUSIONS OF LAW

### A. Liability

40. To establish liability in a medical malpractice case, a plaintiff must show that the defendant departed from a recognized standard of care and that such departure was the proximate cause of the injury. *Merriam v. Wanger*, 757 A.2d 778, 780 (Me.2000) (internal citations and quotations omitted).

41. Negligence alone on the part of the defendant is not enough to impose liability. *Id.*, at 780 n. 1 (internal citations and quotations omitted). Rather, negligence is actionable only if it proximately causes an injury to another. *Id.*

42. Proximate cause is "that cause which, in natural and continuous sequence, unbroken by an ... intervening cause, produces the injury, and without which the result would not have occurred." *Id.* (internal citations and quotations omitted).

43. Evidence is sufficient to support a finding of proximate cause if it indicates that the alleged negligence played a substantial part in bringing about the harm. *Id.*, at 780–81.

44. The mere possibility of such causation is not enough, and a defendant is entitled to judgment if the probabilities are evenly balanced. *Id.*, at 781.

45. Here, the Court finds that Defendant was negligent in its failure to promptly diagnose and treat Benson's cheek cancer.[10] The issue, therefore, is whether Defendant's negligence caused

---

**8.** Dr. Clark has significant experience and specializes in head and neck cancer. He has treated approximately 5000 new patients in his career, of which approximately 200 had cheek cancer.

**9.** Dr. Clark testified that, despite the fact that he has never seen transitional-cell cancers spread from the prostate specifically to the cheek, the location on the skin to where a cancer spreads is irrelevant because "skin is skin."

**10.** Defendant concedes that it should have performed a biopsy of Benson's cheek lesion sometime in September 1997.

Benson's death.[11]

■ 46. In light of the fact that the Court credits the testimony of Defendant's experts over that of Plaintiff's experts, the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that Defendant's negligence in its diagnosis and treatment of Benson's cheek cancer caused his death.

## B. Damages

47. In Count One of her Complaint, Plaintiff seeks emotional distress damages resulting from Defendant's medical malpractice.

48. Notwithstanding the above finding in favor of Defendant on the issue of medical malpractice, the Court finds that Plaintiff is entitled to damages for emotional distress.

■ 49. Under Maine law, a plaintiff's failure to prove the existence of an underlying tort does not preclude recovery for negligent infliction of emotional distress. See Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc., 738 A.2d 839, 848 (Me. 1999) (stating that recovery for negligent infliction of emotional distress is permissible, despite the absence of proof of an underlying tort, where plaintiff demonstrates that the defendant owed her a particular duty based on the unique relationship between the parties).

■ 50. In order to prove negligent infliction of emotional distress a plaintiff must show that: 1) the defendant owed a duty to the plaintiff; 2) the defendant breached that duty; 3) the plaintiff suffered severe emotional distress as a result

of defendant's negligence; and 4) the plaintiff's emotional distress was a reasonably foreseeable consequence of defendant's negligent conduct. See Veilleux v. NBC, 206 F.3d 92, 129–30 (1st Cir.2000); see also Curtis v. Porter, 784 A.2d 18, 25 (Me.2001).

■ 51. In the context of the physician-patient relationship, the physician owes the patient a duty to avoid emotional harm. See Bolton v. Caine, 584 A.2d 615, 618 (Me.1990) (holding that a physician-patient relationship gives rise to a duty to avoid emotional harm from failure to provide critical information to patient).

■ 52. Here, Defendant had a duty that arose from the physician-patient relationship to inform Benson of critical information relevant to a potentially life-threatening disease. Defendant breached this duty by failing to promptly diagnose Benson's cheek tumor.

53. Benson suffered severe emotional distress as a result of Defendant's negligent conduct. At trial, Dr. Feleppa testified that Benson became very quiet upon being informed that his cancer was essentially incurable due to the delayed prognosis and treatment. Similarly, Plaintiff testified that Benson, who was once a very active man, became generally more withdrawn.

54. For approximately one year Benson lived with the understanding that earlier diagnosis and treatment of the cheek lesion by Defendant likely would have altered the course of his disease.[12]

55. Due to the unique nature of a physician-patient relationship, Plaintiff's emo-

---

11. There is no allegation of error with respect to the discovery of Benson's prostate cancer.

12. The Court finds that Benson's emotional distress, though based on a misconception, is nevertheless compensable because his mis-

conception was entirely reasonable in light of the information available to him at the time. See Bolton v. Caine, 584 A.2d 615, 618 (Me. 1990).

tional distress was a reasonably foreseeable consequence of Defendant's negligent conduct. *See id.* ("A factfinder could find it foreseeable that a patient might suffer psychological harm as the result of her physicians' breach of duty to inform her of critical information relevant to a potential life-threatening illness.").

56. Accordingly, the Court awards Plaintiff damages for emotional distress in the amount of $100,000.

SO ORDERED.